UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| MARK PLOEN, | Case No. 21-CV-2248 (PJS/JFD) |
| Plaintiff, | |
| v. | ORDER |
| AIG SPECIALTY INSURANCE COMPANY, | |
| Defendant. | |

| | |
|---|---|
| RICHARD ENRICO, | Case No. 21-CV-2264 (PJS/JFD) |
| Plaintiff, | |
| v. | ORDER |
| AIG SPECIALTY INSURANCE COMPANY, | |
| Defendant. | |

Bryan R. Freeman, MASLON LLP; Rikke A. Dierssen-Morice, BLANK ROME LLP, for plaintiff Mark Ploen.

Mark R. Bradford, BRADFORD, ANDRESEN, NORRIE & CAMAROTTO; Edward F. Fox and James C. Kovacs, BASSFORD REMELE, for plaintiff Richard Enrico.

Thomas H. Boyd and Kyle R. Kroll, WINTHROP & WEINSTINE, P.A., for defendant.

Plaintiffs Mark Ploen and Richard Enrico brought these actions against defendant AIG Specialty Insurance Company ("AIG"), contending that AIG is obligated

to pay stipulated judgments that were entered in favor of Ploen and Enrico and against AIG's insured (AOM Holdings, LLC) pursuant to *Miller-Shugart* agreements. This matter is before the Court on AIG's motion for summary judgment and plaintiffs' cross-motion for partial summary judgment.[1] For the reasons explained below, AIG's motion is denied, and plaintiffs' motion is granted. The Court holds that the AIG insurance policy covers the settlements and that issues of fact preclude summary judgment on whether the settlements are unreasonable or the product of fraud or collusion.

## I. BACKGROUND

In July 2016, plaintiffs Mark Ploen and Richard Enrico each invested $3 million in non-party AOM Holdings, LLC ("AOM") and received "Class B" units in the company. Boyd Decl. [ECF No. 98] Ex. 17 ¶¶ 8–9; *id.* Ex. 18 ¶ 10. In 2020, Ploen and Enrico filed state-court lawsuits against AOM, asserting various claims in connection with the investment, including fraudulent inducement and negligent misrepresentation. *Id.* Exs.

---

[1]Also pending before the Court is AIG's objection to the order of Magistrate Judge John F. Docherty awarding fees to non-parties Tony Jacobson, Kutak Rock, and Fredrickson & Byron. ECF Nos. 82, 85. (Except where otherwise indicated, ECF citations refer to documents filed in *Ploen*, 21-CV-2248 (PJS/JFD).)

Fredrikson & Byron has withdrawn its request for fees and Judge Docherty vacated that portion of his order. *See* ECF Nos. 121, 123. AIG's objection to that portion of the order is therefore moot. With respect to Judge Docherty's award of fees to Jacobson and Kutak Rock, the Court finds nothing clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A) (magistrate judge's order on nondispositve pretrial matters may be reversed only if it is "clearly erroneous or contrary to law"); Fed. R. Civ. P. 72(a) (same). AIG's objection to that fee award is therefore overruled.

17–18. The parties settled these cases by entering into *Miller-Shugart* agreements under which AOM paid each plaintiff $250,000 and stipulated to the entry of $3 million judgments against AOM and in favor of each plaintiff. ECF No. 108-11 at 7–15, 17–25; *see Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982).

Non-party Tony Jacobson, who was AOM's CEO at the time and a friend of both Ploen and Enrico, made a similar $3 million investment in AOM and later brought a similar state-court lawsuit against the company. Boyd Decl. [ECF No. 98] Ex. 19. In Jacobson's case, the trial court granted summary judgment to AOM, and that judgment was affirmed on appeal. *See Jacobson v. AOM Holdings, LLC*, No. A21-1707, 2022 WL 3022376, at *1 (Minn. Ct. App. Aug. 1, 2022). Jacobson recovered nothing.

After entering into the *Miller-Shugart* settlements with AOM, Ploen and Enrico brought these garnishment actions against AIG (AOM's insurer), seeking to force AIG to pay the two $3 million judgments that had been entered against AOM by the state court.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution

might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. Coverage

The interpretation of an insurance policy is a question of law. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Donaldson Co.*, 926 F.3d 1014, 1020 (8th Cir. 2019) (applying Minnesota law).[2] An insured bears the initial burden to show that a claim comes within the policy's coverage. *Westfield Ins. Co. v. Robinson Outdoors, Inc.*, 700 F.3d 1172, 1174 (8th Cir. 2012). The burden then shifts to the insurer to show that an exclusion applies. *Id.* Exclusions are narrowly construed. *Id.* "[C]lear and unambiguous language in a contract is given its ordinary meaning." *Id.* at 1175.

#### 1. Loss

AIG issued an insurance policy ("Policy") to AOM for the policy period November 8, 2018 to November 8, 2020. ECF No. 99 at 7. As relevant to this case, the Policy provides directors and officers ("D&O") liability coverage. *See id.* at 32. The

---

[2]AIG's policy (which is hundreds of pages long) does not appear to contain a choice-of-law clause, but the parties agree that Minnesota law applies. Hr'g Tr. [ECF No. 118] at 15, 53–54.

D&O section provides coverage for a "Loss of the Company arising from a: Claim made against the Company."[3] *Id.* at 32. "Loss" is defined as follows:

> 'Loss' means damages, judgments, settlements, pre-judgment and post-judgment interest, . . . and Defense Costs; *provided, however,* Loss, other than Defense Costs, shall not include:
>
> \* \* \*
>
> (iv)   amounts which may be deemed uninsurable under the law pursuant to which this Policy shall be construed including, without limitation, any disgorgement or payment of ill gotten gains, or any other monies to which an Insured was not legally entitled, as established by final adjudication . . . .

*Id.* at 36.

The amounts sought by Ploen and Enrico fall within the initial portion of the definition of "Loss," as they are "settlements." (They are also "judgments,' because stipulated judgments were entered pursuant to the settlements.) AIG nevertheless argues that the settlement amounts are not "Loss" because they are uninsurable "disgorgement . . . of ill-gotten gains." For this provision to apply, however, the uninsurable nature of the settlements must be "established by final adjudication."

AIG first contends that, under the policy, a "final adjudication" is simply one of multiple ways to establish that the settlement amounts are uninsurable. *See* ECF No. 113 at 3 ("the Policy . . . states a non-exclusive list of examples . . . of Loss that *may*

---

[3] Defined terms in the Policy appear in bold; to improve readability, the Court does not reproduce that formatting.

be 'established by final adjudication.' Thus, final adjudication is not necessary."). This argument distorts the language and grammatical structure of the provision. The provision does not provide that uninsurability "may" be established by final adjudication. Instead, it lists examples of amounts that may be deemed to be uninsurable, and then dictates the method by which the uninsurable nature of the amounts must be determined: "as established by final adjudication."

This reading flows not only from the structure of the provision, but also from common sense. There would be no reason to mention "final adjudication" as the *sole* example of various non-exclusive ways that uninsurability could be established. Indeed, a final adjudication is the most obvious and indisputable way to establish uninsurability; if other, less formal methods were also sufficient, one would expect the Policy to list them instead of (or at least in addition to) a final adjudication. The Court therefore holds that, under the definition of "Loss," an amount cannot be regarded as uninsurable unless its uninsurable nature is "established by final adjudication." *See USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 517 (7th Cir. 2022) ("This [final adjudication] requirement is strictly construed. If an underlying claim is settled, rather than adjudicated, then the exclusion does not apply."); *Pendergest-Holt v. Certain Underwriters at Lloyd's of London*, 600 F.3d 562, 572 n.28 (5th Cir. 2010) ("For those forms which require a final adjudication, courts have consistently held that the adjudication

must occur in the underlying D&O proceeding (not in coverage litigation) and therefore the exclusion is inapplicable if the claim against the D&Os is settled." (citation and quotation marks omitted)).

To the extent that AIG may contend that *this* Court can supply the necessary final adjudication, AIG is mistaken. *See USA Gymnastics*, 27 F.4th at 517 (to satisfy the "final adjudication" requirement, "the wrongful conduct must have been determined to have occurred by court judgment or other final adjudication in a separate action in which the conduct was at issue"); *Pendergest-Holt*, 600 F.3d at 572 ("When a D&O policy requires a 'final adjudication' to trigger an exclusion, courts have consistently held that the adjudication must occur in the underlying D&O proceeding, rather than in a parallel coverage action or other lawsuit." (citation and quotation marks omitted)).

To hold otherwise would render the requirement meaningless. As a general matter, any insurer may argue in any coverage action that a loss is legally uninsurable. The purpose of the "final adjudication" requirement is therefore not to protect the insurer; instead, the requirement is plainly meant to protect the insured by imposing a procedural requirement that must be met before the insurer can deny coverage on the basis that the loss is uninsurable. Permitting the coverage action to meet the "final adjudication" requirement would circumvent this protection by allowing the insurer to deny coverage before there has been a final adjudication, forcing the insured to litigate

the issue, and ultimately leaving the insured no better off than if the provision did not exist.

AIG next contends that the *Miller-Shugart* agreements establish that the settlements are uninsurable disgorgements because, pursuant to the agreements, payment of the judgments serves to retire Ploen's and Enrico's Class B units. ECF No. 108-11 at 12–13, 22–23. This does not help AIG, however, as the agreements are not "adjudications." The agreements themselves state that they are not intended to be adjudications. *Id.* at 10, 20. More fundamentally, the plain meaning of "adjudication" connotes a decision by a neutral arbiter, not a settlement reached by opposing parties. *In re Welfare of J.J.P.*, 831 N.W.2d 260, 266 (Minn. 2013) ("The word 'adjudicate,' the root of the word 'adjudication,' means '[t]o rule upon judicially,' or to 'adjudge.'" (quoting *Black's Law Dictionary* 45 (8th ed. 2004)).

True, the state court entered stipulated judgments based on the *Miller-Shugart* agreements. *See* Boyd Decl. [ECF No. 26], Exs. 13–14 (stipulated judgments). But those judgments are not adjudications on the merits and they make no findings or conclusions about the insurability (or even the nature) of the settlement amounts. At most, the judgments direct Ploen and Enrico to collect those judgments in "compl[iance] with the terms and conditions of the parties' *Miller-Shugart* Settlement Agreement." *Id.* Ex. 13 ¶ 4; *id.* Ex. 14 ¶ 4. Even if this could be read as incorporating the *Miller-Shugart*

-8-

agreements (including the provisions that retire plaintiffs' Class B units), the fact remains that the judgments do not contain any findings or conclusions as to the nature of the settlement amounts and cannot be regarded as establishing, by adjudication, that the settlements are uninsurable. This is particularly true because, if the judgments are regarded as incorporating the *Miller-Shugart* agreements, then those judgments would also incorporate the language in the agreements disclaiming any intent to be "an adjudication or admission regarding any of the issues in this Litigation." ECF No. 108-11 at 10, 20.

The Court therefore rejects AIG's argument that there has a been a "final adjudication" that the settlement amounts are uninsurable. As a result, the provision that excludes "amounts which may be deemed uninsurable" from the definition of "Loss" is inapplicable.

2. Exclusion 4(h)

AIG next argues that coverage is excluded under Exclusion 4(h) of the Policy. Exclusion 4(h) excludes coverage for a claim:

> . . . which is brought by any security holder, creditor or other interest holder of the Company . . ., unless such security holder's, creditor's or other interest holder's Claim is instigated and continued independent of, and without the active solicitation, active assistance, or active participation of, or intervention of, any Company or any Executive of a Company[.]

ECF No. 99 at 43. The parties agree that Ploen and Enrico are "security holder[s]" of AOM, but the parties dispute whether Ploen and Enrico "instigated and continued" their underlying claims "independent of, and without the active solicitation, active assistance, or active participation of" Tony Jacobson (their friend and AOM's former CEO).

The Court need not resolve this issue, however, because even if Exclusion 4(h) applies, plaintiffs' underlying claims come within Carveout (iii) to Exclusion 4(h). That carveout provides as follows:

> [T]his exclusion [i.e., Exclusion 4(h)] shall not apply to:
>
> \*    \*    \*
>
> (iii)   any Claim brought by any former Executive of a Company who has not served in such capacity for a Company for at least two (2) years prior to such Claim being first made against any person[.]

ECF No. 99 at 43–44.

### a. *"former Executive"*

Carveout (iii) first requires that the "Claim" be made by a "former Executive." The Policy defines "Executive" to include "any past, present or future duly elected or appointed director" of any of various types of entities, including corporations and limited liability companies. ECF No. 99 at 12.

Ploen and Enrico are both former directors of AllOver Media, Inc. (a corporation). ECF No. 108-19 at 36–37 (May 12, 2003, written action of AllOver Media, Inc., board appointing Enrico as a member); *id.* at 69–71 (April 18, 2011, AllOver Media, Inc., board minutes noting the appointment of Mark Ploen as a member). Ploen's service on AllOver Media, Inc.'s board of directors ended in 2015, and Enrico's ended in 2004. ECF No. 108-19 at 54 (September 3, 2004 written action of AllOver Media, Inc. shareholders); *id.* at 94–100 (March 10, 2015, limited liability company agreement of AllOver Media, LLC); Ploen Dep. 19 [ECF No. 108-2 at 7]. Both Ploen and Enrico therefore qualify as "former Executive[s]" under the Policy.

*b. "Company"*

The next question is whether AllOver Media, Inc., qualifies as a "Company." This dispute turns on the relationship between AllOver Media, Inc., and AllOver Media, LLC, the latter of which is a subsidiary of AOM. For ease of discussion, the Court will refer to these entities as "Corporation" and "LLC," respectively.

The Policy defines "Company" as "the Named Entity and any Subsidiary thereof." ECF No. 99 at 10. AOM is the "Named Entity," ECF No. 99 at 159, and therefore any "Subsidiary" of AOM is a "Company." Drilling down through the definition of "Subsidiary," it is clear that LLC is a "Subsidiary."

A "Subsidiary" includes "any for-profit entity, whose equity securities are not publicly traded, of which the particular Named Entity has or had Management Control . . . on or before the inception date of the Policy Period."  ECF No. 99 at 15. "Management Control" includes "possessing greater than 50% ownership interest in a . . . limited liability company."  ECF No. 99 at 13–14.  On March 10, 2015, AOM became the sole member of LLC.  ECF No. 108-19 at 86–88.  As a result, AOM "had Management Control . . . on or before the inception date of the Policy Period" (November 8, 2018), making LLC a "Subsidiary."[4]  ECF No. 99 at 15.

As discussed above, however, plaintiffs were "Executive(s)" of Corporation, not of LLC.  The question, then, is whether Corporation *also* qualifies as a "Subsidiary" (and therefore a "Company").

On March 9, 2015, Corporation (a Delaware corporation) converted itself to LLC, (a Delaware limited liability company) pursuant to Del. Code Ann. tit. 6, § 18–214.  ECF No. 108-19 at 73–75.  Under § 18–214(g), "the conversion shall not be deemed to constitute a dissolution" of the original entity and "for all purposes of the laws of the State of Delaware, the limited liability company shall be deemed to be the same entity

---

[4]While AOM continues to have "Management Control" over LLC, *see* Hr'g Tr. 99, this is actually irrelevant; a "Subsidiary" includes entities over which AOM "has *or had* Management Control . . . on *or before* the inception date of the Policy Period."  ECF No. 99 at 15 (emphasis added).

as the converting other entity and the conversion shall constitute a continuation of the existence" of the original entity.

Under Delaware law, therefore, LLC is "deemed to be the same entity" as Corporation. *Cf. ARCPE Bahamas LLC v. Neuman*, No. 19-CV-24654-UU, 2020 WL 6870904, at *5 (S.D. Fla. Oct. 16, 2020) ("The Court finds that there is no break in the Note's chain of title because CapitalSource International, LLC is deemed to be the same entity as CapitalSource International, Inc. as a matter of law" under § 18–214(g).). Although Minnesota law applies to the interpretation of the Policy, Minnesota law dictates that the law of the state of incorporation determines the nature of a corporate entity. *Gassert v. Com. Mechanisms, Inc.*, 277 N.W.2d 392, 393 (Minn. 1979) ("Since it is undisputed that CMI is a Missouri corporation, the Missouri survival statute applies."); *Kratky v. Andrews*, 28 N.W.2d 624, 626 (Minn. 1947) ("The law of the state of incorporation governs as to dissolution of a corporation and its right after dissolution to exercise its corporate functions anywhere."); *Erickson-Hellekson-Vye Co. v. A. Wells Co.*, 15 N.W.2d 162, 168–69 (Minn. 1944) (noting that the laws of the state of origin that govern a corporation's charter "follow the corporation into another state and are recognized and enforced there" (citation and quotation marks omitted)).

Accordingly, LLC and Corporation are one and the same entity for purposes of both Delaware *and* Minnesota law. And because LLC is a "Subsidiary," Corporation is

also a "Subsidiary" (and therefore a "Company"). Plaintiffs are thus both "former Executive[s] of a Company."

AIG resists this conclusion, arguing that the Policy requires plaintiffs to have been "Executive[s]" of an entity *during the time* that AOM had "Management Control" of that entity. In support of this argument, AIG points to the proviso in the definition of "Subsidiary" clarifying that there is no coverage for claims against a "Subsidiary" for acts occurring either before the "Named Entity" acquired "Management Control" or after the "Named Entity" ceased to have such control. *See* ECF No. 99 at 15–16.

But that language does not change the result. To begin with, the proviso is irrelevant here, as plaintiffs' state-court lawsuits were against AOM itself, not any subsidiary, and in any event arose out of acts that occurred while AOM had "Management Control." Setting that aside, far from helping AIG, the proviso indicates that, once an entity has acquired the status of "Subsidiary," the Policy uses that term to refer to the entity generally, without distinguishing between the time periods before and after AOM acquired control of the entity.[5] Were it otherwise, the Policy would not

---

[5]There is nothing linguistically unusual or paradoxical about referring to something by a later-acquired status even for time periods before it acquired that status. It is not uncommon, for example, for a wife to describe the first time she met her "husband," even though they obviously were not married at the time. Consequently, the fact that Carveout (iii) refers to a "former Executive of a [Subsidiary]" does not, by itself, require that the "Executive['s]" service occur after AOM acquired "Management Control."

need to specify that there is no coverage for claims against a "Subsidiary" that arose before the "Named Entity" acquired "Management Control" or after the "Named Entity" no longer had such control.

AIG also points to the definition of "Management Control," noting its use of the present tense (e.g., defining "Management Control" as "owning" certain interests, "having" certain rights, etc.). ECF No. 99 at 13–14. But this language does not dictate that an entity is a "Subsidiary" only during the period when the Named Entity has "Management Control." To the contrary, the definition of "Subsidiary" expressly includes entities over which the Named Entity no longer has "Management Control." *Id.* at 15 (defining "Subsidiary" to include entities of which the Named Entity "has *or had* Management Control . . . on or before the inception date of the Policy Period" (emphasis added)). The Court therefore rejects AIG's argument that the Policy requires plaintiffs to have been "Executive[s]" during the time that AOM had "Management Control."

*c. "any person"*

Finally, AIG contends that Carveout (iii)'s reference to "any person" requires that, for a claim to fall within the carveout, the claim must be brought against a human being. Because Ploen's and Enrico's underlying actions were brought against AOM

(which is not a human being), AIG contends that the carveout does not apply to those actions.

If AIG were correct, Carveout (iii) would be a strange provision; the Court can conceive of no reason why the carveout would apply only to claims against human beings, but not to any other type of claim. In any event, AIG is not correct. The carveout does not apply to "any Claim brought *against* any person," as AIG would have it. Instead, the carveout applies to "any Claim brought *by* any former Executive of a Company" (so long as that "Executive . . . has not served in such capacity for a Company for at least two (2) years prior to such Claim being first made against any person"). ECF No. 99 at 44 (emphasis added). In other words, application of the carveout turns on who *brought* the claim, not on whom the claim is brought *against*.

AIG argues that, if the phrase "against any person" is not confined to human beings, the phrase becomes superfluous. But as Ploen and Enrico note, the definition of "Claim" is extremely broad and includes, among other things, any written demand for monetary or non-monetary relief, including a request to toll or waive any statute of limitations; any civil, criminal, administrative, regulatory, arbitral, or other dispute-resolution proceeding; and any civil, criminal, administrative, or regulatory investigation or inquiry by a federal, state, local, foreign, or offshore government authority or agency. ECF No. 99 at 8–9. It is also important to note that the carveout

does not refer to a "Claim" being made by an "Executive" within two years of executive service; instead, the carveout is written in the passive voice, referring to "such Claim being first made against any person." This use of the passive voice—along with the use of the phrase "any person"—ensures that the carveout does not apply (and coverage is therefore excluded) whenever *anyone* (including any governmental or regulatory body) first made "such Claim" (including any civil, criminal, administrative, or regulatory investigation or inquiry) against *any* person (whether insured or not) within two years of the "Executive" serving in that capacity for a "Company." The Court therefore rejects AIG's argument that the carveout applies only to "Claims" made against natural persons.

In short, there is no dispute that no "such Claim" was made against "any person" by anyone within two years of Ploen's and Enrico's service as board members of AllOver Media, Inc. Moreover, as the Court has found, Ploen and Enrico meet the other conditions of the carveout. Therefore, Carveout (iii) applies, and coverage is not excluded by Exclusion 4(h).

### C.  *Reasonableness*

Finally, AIG moves for summary judgment on the basis that, even if the *Miller-Shugart* settlements are covered under the Policy, they are unreasonable and collusive and therefore unenforceable against AIG. *See King's Cove Marina, LLC v. Lambert Com.*

*Constr. LLC*, 958 N.W.2d 310, 321 (Minn. 2021) ("A *Miller-Shugart* settlement agreement is enforceable against the insurer if . . . the settlement is reasonable and not the product of fraud or collusion."). Whether the settlements are unreasonable or collusive are fact-intensive issues better left for trial, however. AIG's motion for summary judgment on these issues is therefore denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant's motion for summary judgment [Case No. 21-CV-2248, ECF No. 95; Case No. 21-CV-2264, ECF No. 99] is DENIED.

2. Plaintiffs' motion for partial summary judgment [Case No. 21-CV-2248, ECF No. 104; Case No. 21-CV-2264, ECF No. 109] is GRANTED.

3. Defendant's objection [Case No. 21-CV-2248, ECF No. 85; Case No. 21-CV-2264, ECF No. 89] to the September 20, 2022 order of Magistrate Judge John F. Docherty [Case No. 21-CV-2248, ECF No. 82; Case No. 21-CV-2264, ECF No. 86], as amended on April 18, 2023 [Case No. 21-CV-2248, ECF No. 123; Case No. 21-CV-2264, ECF No. 131] is OVERRULED IN PART and DENIED AS MOOT IN PART and the order, as amended, is AFFIRMED.

Dated: September 13, 2023            s/Patrick J. Schiltz
                                                                            Patrick J. Schiltz, Chief Judge
                                                                            United States District Court