UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MARK PLOEN, | Case No. 21-CV-2248 (PJS/JFD) |
| Plaintiff, | |
| v. | ORDER |
| AIG SPECIALTY INSURANCE COMPANY, | |
| Defendant. | |

---

| | |
|---|---|
| RICHARD ENRICO, | Case No. 21-CV-2264 (PJS/JFD) |
| Plaintiff, | |
| v. | ORDER |
| AIG SPECIALTY INSURANCE COMPANY, | |
| Defendant. | |

---

Bryan R. Freeman, MASLON LLP; Rikke A. Dierssen-Morice, BLANK ROME LLP, for plaintiff Mark Ploen.

Mark R. Bradford, BRADFORD ANDRESEN NORRIE & CAMAROTTO, for plaintiff Richard Enrico.

Thomas H. Boyd and Kyle R. Kroll, WINTHROP & WEINSTINE, P.A., for defendant.

Plaintiffs Mark Ploen and Richard Enrico brought these actions against

defendant AIG Specialty Insurance Company ("AIG"), contending that AIG is obligated

to pay stipulated judgments that were entered in favor of plaintiffs and against AOM Holdings, LLC (which was insured by AIG) pursuant to *Miller-Shugart* agreements.[1] AIG contends that the *Miller-Shugart* agreements are unreasonable and therefore unenforceable.

This matter was tried to the Court. Having heard the evidence and the arguments of counsel and carefully reviewed the record, the Court makes the following conclusions of law and findings of fact pursuant to Fed. R. Civ. P. 52(a)(1).

## I. CONCLUSIONS OF LAW

1.      "Under a *Miller-Shugart* settlement agreement, a plaintiff and an insured defendant stipulate to a judgment against the defendant on the condition that the plaintiff releases the defendant from any personal liability and agrees to seek recovery solely from the insurer." *King's Cove Marina, LLC v. Lambert Com. Constr. LLC*, 958 N.W.2d 310, 320–21 (Minn. 2021).

2.      "A *Miller-Shugart* settlement agreement is enforceable against the insurer if the insurer receives notice of the settlement, and the settlement is reasonable and not the product of fraud or collusion." *Id.* at 321.

3.      The reasonableness of the settlement is a question of fact. *Id.*

---

[1]*See Miller v. Shugart*, 316 N.W.2d 729 (Minn. 1982).

-2-

4.      "The burden of proof is on the claimant, the plaintiff judgment creditor, to show that the settlement is reasonable and prudent." *Miller*, 316 N.W.2d at 735; *see also Jorgensen v. Knutson*, 662 N.W.2d 893, 904 (Minn. 2003) (plaintiff bears the burden to prove the settlement is reasonable).

5.      "The test as to whether the settlement is reasonable and prudent is what a reasonably prudent person in the position of the defendant would have settled for on the merits of plaintiff's claim." *Miller*, 316 N.W.2d at 735. Applying this test requires consideration of "the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial." *Id.*; *see also Jorgensen*, 662 N.W.2d at 904 (courts may consider "what a jury could award" as well as "other relevant factors such as an undisputed injury; the risks of trial; expert testimony for both parties on issues of the likely size of a jury award, the extent of damages and liability; and the judge's own personal experience with jury awards in similar cases."); *Alton M. Johnson Co. v. M.A.I. Co.*, 463 N.W.2d 277, 279 (Minn. 1990) (courts should consider evidence on liability and damages as well as other evidence such as expert testimony, "verdicts in comparable cases, the likelihood of favorable or unfavorable rulings on legal defenses and evidentiary issues if the tort action had been tried, and other factors of forensic significance").

6.      This does not mean, however, that courts must "conduct[] the very trial obviated by the settlement."  *Alton M. Johnson Co.*, 463 N.W.2d at 279.

## II.  FINDINGS OF FACT

### A.  *AOM Holdings, LLC*

1.      The underlying lawsuits that produced the *Miller-Shugart* agreements at issue in these cases arose out of $3 million investments that each plaintiff made in AOM Holdings, LLC ("AOM") in July 2016.

2.      AOM was a holding company that provided advertising services through its subsidiary, AllOver Media LLC.  Trial Tr. ("TT") 192–93.  For ease of discussion, and because the specifics of AOM's corporate structure are not relevant to the reasonableness of the settlements, the Court will refer to the AOM entities (including their corporate predecessors) collectively as "AOM."

3.      AOM was founded by Tony Jacobson in the early 2000s.  TT 12–13.  In July 2016, when plaintiffs made the $3 million investments at issue in these cases, Jacobson was AOM's CEO—and he, like each plaintiff, invested $3 million in the company.  TT 192.

4.      Plaintiffs are sophisticated businessmen and investors with experience in owning and operating multimillion-dollar businesses.  TT 68–69, 567, 570, 572, 575.  Ploen has also formed several investment groups.  TT 69–70.

-4-

5.      Plaintiffs were friends of Jacobson's.  They were also early investors in AOM and had previously served on its board of directors.  TT 12–14, 284–85, 573–75.  In addition, Enrico was a client of AOM's and, in fact, was its largest customer in the 2009–2010 time frame.  TT 575.

6.      Over the years, plaintiffs had each made a number of loans to AOM, all of which were repaid in full, with interest.  TT 17–18, 574.

7.      In 2015, Audax, a private-equity company, bought a controlling interest in AOM.  Ex. P83 at 31; TT 191.

8.      Following the acquisition, AOM began experiencing financial challenges due to falling revenue.  Ex. P41 at 3, 5; Ex. P83 at 75.

9.      As of April 2016, AOM's year-to-date revenue was down more than 20 percent from the corresponding period in 2015, and AOM's EBITDA[2] was down almost 80 percent from that period.  Ex. P41 at 3, 5.

10.     In the underlying lawsuits, AOM's president and CFO, Shaun Nugent, testified that "our business was not doing as well as we had planned and . . . we were falling behind on revenue."  Ex. P83 at 75.

---

[2]"EBITDA" stands for "[e]arnings before interest, taxes, depreciation, and amortization."  *Black's Law Dictionary* 551 (8th ed.).

11.    Also following Audax's acquisition, AOM took out a number of loans, amassing around $50 million in debt.  Ex. P83 at 33–34; Ex. P41 at 11; Ex. P43 at 3; TT 195.

12.    AOM's primary lender, BMO Harris ("BMO"), required AOM to maintain certain financial covenants, with compliance being measured quarterly.  Ex. P39 § 7.12; Ex. P83 at 37–38; TT 197–198.  If AOM fell out of compliance with any of the covenants, AOM's lenders would have the right to accelerate the repayment of their loans.  TT 199; Ex. P83 at 41; Ex. P39 § 8.02.

13.    In 2016, State Farm, one of AOM's largest customers, *see* Ex. P82 at 4, provided AOM with a letter of intent to continue doing business.  As of June of that year, however, State Farm had not actually contracted with AOM for any services.  Ex. P70.

14.    By June 1, AOM was projecting that, without State Farm's business, it would fail its quarterly loan-covenant tests in June, September, and December.  Even with State Farm's business, AOM would still be at risk of failing the tests.  TT 22–23; Ex. P43 at 3; Ex. P56 at 1 (email from Nugent stating that if State Farm did not contract for any services, "[t]hat would possibly blow the 3q covenants").

15.    In mid-June 2016, AOM's internal analysis showed that it had been out of compliance with its loan covenants in April and May.  Ex. P42 at 8.

### B.  Plaintiffs' July 2016 Investments in AOM

16.     In early June 2016, Nugent proposed that AOM seek capital contributions from Ploen, Enrico, and Jacobson as a means of addressing AOM's growing financial problems.  Ex. P43 at 1 (proposing "equity cure" from the "Trifecta"); TT 22 ("trifecta" referred to Ploen, Enrico, and Jacobson); Ex. P45 at 1 (June 1 email from Nugent suggesting that they "shoot for $5m from the boys").

17.     The idea was to use the capital infusion to retire high-interest debt.  TT 16–17.

18.     The proposed transaction was initially described to plaintiffs as a loan, TT 15–16, Ex. P80, likely because Ploen and Enrico had positive experiences making loans to AOM in the past.  But because AOM's agreement with BMO prohibited it from borrowing money if it was out of compliance with its covenants, the transaction had to be structured as an investment.  TT 221–22; Ex. P39 § 7.01; Ex. P45 at 2.

19.     Under the proposed investment, plaintiffs would each purchase 3,000 Class B shares of AOM.  TT 287.  The investments were otherwise intended to function like the loans that plaintiffs had made in the past, with the same 10 percent "interest rate" paid as quarterly dividends, and with the expectation that AOM would buy back the shares within two years.  *Cf.* Ex. P49 at 1 (10% "interest" would be paid quarterly);

Ex. P58 at 2 (the money would be paid back within 12 to 18 months); Ex. P80 at 1 (email

from AOM executive referring to the transactions as a "loan").

20.    Nugent and Jacobson communicated to plaintiffs that the transaction was

a "win-win" and a "no brainer" and that the business was doing well.  TT 44–45,

592–93; Ex. P59.

21.    Based on his previous experiences loaning money to AOM, and because

AOM was backed by Audax, Ploen was comfortable proceeding with the proposed

transaction.  TT 17–18.  Similarly, based on his past experiences with AOM and

Jacobson, Enrico was comfortable with the proposed transaction and did not feel the

need to review any audited financial statements or similar documentation.  TT 578, 583.

22.    The parties eventually agreed to a $9 million investment, with Ploen,

Enrico, and Jacobson each investing $3 million.  TT 24; Ex. D16.  The increase in the

proposed investment appears to be related to AOM's increasingly troubled financial

condition.  Ex. P56 at 1 (email from Nugent stating that a $6 million investment would

provide "less than $500K of cushion").

23.    Plaintiffs each received emails and transaction documents making clear

that the transaction was an investment.  TT 73–74, 98; Ex. D13.  Plaintiffs also

understood that AOM had to satisfy its bank covenants before it could make cash

dividend payments.  TT 101; Ex. D16.  Plaintiffs were also informed that, in the event

that AOM could not make dividend payments in cash, the payments would be made in kind (i.e., by issuing additional shares).  TT 74–75, 98; Ex. D13; Ex. D16; Ex. D21.

24.    Before the July 6 closing, plaintiffs had the transaction documents reviewed by their own respective outside counsel, who informed them that the transaction was an investment.  TT 80–84, 581–82, 605.  Enrico's lawyer also highlighted the documents' anti-reliance language and offered to assist with a due-diligence investigation, if Enrico so desired.  Ex. D34 at 2–3.

25.    The transaction documents recite that plaintiffs had the right to obtain any information necessary to make an informed decision and to verify the accuracy of any information they had received.  TT 94–95; Ex. D51 § 3.6.  Plaintiffs also signed warranties representing that they were accredited investors and capable of evaluating the merits of the investment for themselves.  Ex. D51 §§ 3.4–3.5.

26.    Ploen and Jacobson financed their investments by borrowing $1.5 million each from Enrico and jointly borrowing the remaining $3 million from Signature Bank.  TT 26, 30, 87, 631.  The loans were at a quarterly interest rate of 4 percent and payable in two years.  TT 26, 30.

27.    Enrico earned approximately $420,000 in interest off of the loans he made to Ploen and Jacobson.  TT 631–32.  For his part, Ploen made approximately $290,000 in interest payments through 2021 (including the interest payments that Ploen made on

the Signature Bank loan and subtracting the tax benefits that Ploen received from deducting the interest payments).  Ex. P10; TT 59–60.

28.    The transactions were set to close on July 6, 2016.  TT 39.

29.    A few weeks before the closing, Audax proposed to AOM's lenders that, in light of the anticipated $9 million investment, AOM's lenders would amend the loan covenants to make them easier to meet, while still applying the older, stricter covenants to determine whether AOM would be permitted to make dividend payments in cash. Ex. P61; TT 219–20.  These changes were approved and were put in place in August 2016.  TT 219–20.

30.    Shortly before the closing, AOM's lenders proposed adding a covenant requiring AOM to have a minimum of $3 million of liquidity before AOM could pay cash dividends.  TT 98–99; Ex. P67.

31.    On July 5, Nugent emailed Ploen and Jacobson about the proposed liquidity covenant, letting them know that AOM planned to agree to the covenant and that failing to meet the covenant would prohibit AOM from paying cash dividends. Ex. P67.  Nugent downplayed the significance of the requirement, stating that AOM's "current expectation is that we will be in excess of $8M at year end so it is not an issue from our side."  Ex. P67.

32.     Based on the fact that Ploen and Jacobson were both informed of the new liquidity requirement—and based on the fact that the record contains no evidence that any important communication about the $3 million investments was made to Ploen but not to Enrico—the Court finds it more likely than not that Enrico was also told about the new liquidity requirement before the transactions closed.  An email exchange between Nugent and Audax demonstrates that Nugent intended that all three men be informed of this change.  Ex. P66.  In addition, in his state-court complaint, Enrico alleged that he relied on Nugent's statement in the July 5 email that AOM would be in excess of $8 million at year's end and, with that and other representations in mind, he went ahead with the closing.  Ex. P24 ¶¶ 14–15, 17; *see also* Ex. P67.  This allegation strongly implies that Enrico was informed of the new liquidity requirement before the closing.  The Court therefore discredits Enrico's testimony that he was not informed of the new liquidity requirement.  *See* TT 590.

33.     In the days and hours leading up to the July 6 closing, AOM received a slew of bad financial news.  In particular, on July 5, just before Nugent told Ploen and Jacobson that AOM expected to have in excess of $8 million in liquidity at the end of the year, Nugent was told that AOM's June sales were $1 million short of its forecasts and that Starbucks had decided not to renew.  Exs. P70, P74; TT 39.  Nugent acknowledged the bad news, calling it a "[b]ig miss."  Ex. P70 at 2.

34.    The next day, July 6, just hours before the closing, AOM learned that State Farm had decided to cancel its letter of intent and would not be contracting for any services from AOM.  TT 36–37; Exs. P73, P74.  Nugent emailed Jacobson and others about the bad news, stating that he was not sure what it would mean, but "I think we need to make a downward adjustment to our Forecast by at least $2M.  This is going to hurt!"  Ex. P73; TT 36–37, 39.

35.    The closing on plaintiffs' $3 million investments took place as planned on July 6, 2016.  Later that evening, AOM produced an updated financial projection that predicted that the company would not meet the covenants necessary to pay cash dividends. TT 594–95; Ex. P79.

36.    Plaintiffs never received any cash dividends from AOM, nor did AOM ever buy back their shares.  TT 47, 49–50, 596.  Instead, plaintiffs received dividends in kind—meaning that the amounts that would have been paid in cash had AOM met the necessary covenants were instead added to the amount of principal owned by plaintiffs. TT 49–51.  Plaintiffs then had to pay taxes on this "phantom" income.  TT 51, 597–98.

*C.  The Underlying Lawsuits*

37.    In early 2020, plaintiffs commenced separate state-court lawsuits against AOM alleging both fraudulent inducement and negligent misrepresentation.  Exs. P23–24.  Plaintiffs primarily sought rescission and return of their $3 million investments

as well as interest, attorney's fees, and reimbursement for the taxes they had to pay on the phantom income.  Both plaintiffs also alleged breach of the duty of good faith and fair dealing, and Enrico brought a separate claim of intentional misrepresentation. Exs. P23–P24.  In addition, Ploen sought to recover for the interest that he had paid for the loans he took out to fund the investment.  TT 64.

38.    Plaintiffs' misrepresentation claims focused on statements concerning AOM's intent and ability to pay cash dividends.  Plaintiffs further alleged that AOM purposely took steps to ensure that it would be out of compliance with its loan covenants so that it would not have to pay cash dividends to them.  Exs. P23–P24.

39.    In both Ploen's action and Enrico's action, AOM moved to dismiss the complaint.  The judges assigned to the cases agreed that (1) Delaware law governed plaintiffs' claims; (2) plaintiffs had adequately alleged claims of both negligent misrepresentation and fraudulent inducement;[3] (3) the anti-reliance language in the transaction documents was insufficient, under Delaware law, to defeat plaintiffs' claims; and (4) plaintiffs failed to state a claim for breach of the duty of good faith and fair dealing.  Exs. P25–P26.

---

[3]The judge in Enrico's case dismissed Enrico's intentional-misrepresentation claim, finding that it was duplicative of his fraudulent-inducement claim.  Ex. P26.

40.    Following the courts' rulings on the motions to dismiss, the parties engaged in discovery, and AOM gave notice that it would be filing motions for summary judgment. *See, e.g.*, Exs. D133–135; TT 269.

*D. The Settlements*

41.    In May 2021, around the time that AOM noticed the summary-judgment motions, plaintiffs and AOM participated in a mediation before James Gilbert, a retired Justice of the Minnesota Supreme Court.  TT 64, 526.

42.    About a month later, the parties executed *Miller-Shugart* settlements for a stipulated judgment of $3 million each.  TT 64–65; Exs. P92–P93.  The parties allocated the amounts entirely to plaintiffs' negligent-misrepresentation claims; the parties did not allocate a single cent to the fraudulent-inducement claims.  Ex. P92 at 4–6; Ex. P93 at 4–6.

43.    In addition to the stipulated judgment, the settlements required AOM to pay Ploen and Enrico $250,000 each.  Ex. P92 at 6; Ex. P93 at 6.

44.    The settlements provide that, if they are found to be unenforceable for any reason, plaintiffs have no recourse against AOM other than as provided in the settlements, Ex. P92 at 8; Ex. P 93 at 8—meaning that plaintiffs cannot pursue their claims against AOM even if the settlements are found to be unenforceable against AIG.

-14-

45.    In July 2021, the agreements were incorporated into $3 million judgments entered in the underlying cases.  Exs. P36–P37.  Plaintiffs then filed these actions.

### III.  THE REASONABLENESS OF THE SETTLEMENTS

Having considered the *Miller-Shugart* agreements, the evidence, and the arguments of counsel, the Court finds that the settlements are unreasonable and therefore not enforceable against AIG.

As noted, determining whether a settlement is reasonable "involves a consideration of the facts bearing on the liability and damage aspects of plaintiff's claim, as well as the risks of going to trial."  *Miller*, 316 N.W.2d at 735.  Because plaintiffs allocated all of the settlement amounts to their negligent-misrepresentation claims, the Court analyzes the reasonableness of the settlement by considering the liability and damage aspects of those claims (as well as the other factors identified in *Miller* and its progeny).[4]

---

[4]Plaintiffs argue that their allocation is irrelevant because both their negligent-misrepresentation claims and their fraudulent-inducement claims are covered by insurance.  Further, they seem to invite the Court to evaluate the settlements in light of both sets of claims, which, in turn, would seem to require the Court to make its own judgment about how the settlements could or should have been allocated under the two-step inquiry set forth in *King's Cove Marina, LLC v. Lambert Com. Constr. LLC*, 958 N.W.2d 310 (Minn. 2021).

*King's Cove*, however, applies when parties *fail* to allocate between covered and uncovered claims.  *Id.* at 323 (setting forth a two-step inquiry for evaluating the "reasonableness of an *unallocated Miller-Shugart* settlement agreement" (emphasis

(continued...)

Plaintiffs' expert testified that AOM's potential liability to Ploen was just over $4 million.[5]  This included (1) the $3 million investment; (2) about $187,000 in tax liability for the phantom in-kind dividend payments; (3) about $290,000 for the interest Ploen incurred to finance the investment; and (4) about $500,000 in prejudgment interest.  TT 309–10.  Likewise, the expert testified that AOM's potential liability to Enrico was around $3.5 million.  TT 309–10.  This included (1) the $3 million investment; (2) about $53,000 in tax liability; and (3) about $500,000 in prejudgment interest. TT 309–310.  These amounts did not include attorney's fees, which the expert admitted plaintiffs were unlikely to be able to recover in the underlying lawsuits.  TT 310–12.

The parties dispute whether Enrico's maximum recovery should be reduced by the interest that he earned on the loan that he made to Ploen.  The Court is inclined to agree with plaintiffs that those interest payments are not relevant in calculating the amount to which Enrico would be entitled if his contract with AOM were rescinded, as

---

[4](...continued) added)).  In this case, plaintiffs *allocated* the settlements and, in so doing, assigned all of the settlement proceeds to the negligent-misrepresentation claims and none to the fraudulent-inducement claims.  Because plaintiffs themselves allocated the settlements, the type of inquiry called for in *King's Cove* does not apply.  Moreover, even if *King's Cove* did apply, the Court would still find the settlements unreasonable, as explained in more detail below.

[5]The expert testified that this amount (and the amount assigned to Enrico) did not represent the "full value" of plaintiffs' claims.  TT 312.  The expert did not explain what additional amounts plaintiffs could potentially recover, however, and therefore the Court gives no weight to this aspect of his testimony.

-16-

the loan transaction was between him and Ploen and did not directly involve AOM.  By the same token, it is not at all clear to the Court that if Ploen were successful in rescinding the contract (and thereby getting back his $3 million investment), he would be entitled to recover, from AOM, the interest payments that he made to Enrico and the bank.[6]  The purpose of rescission is to restore the parties to the status quo ante.  *See Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 61 (Del. 2022) ("Generally, rescission results in abrogation or unmaking of an agreement, and attempts to return the parties to the status quo." (cleaned up)).  AOM did not receive Ploen's interest payments, and thus the Court doubts that AOM could have been required to disgorge those payments.

But even taking plaintiffs' calculation of their maximum recovery at face value, the settlement amounts are astonishingly high: Ploen recovered 80 percent and Enrico 91 percent of the amounts that their expert witness identified as the *maximum* they could have recovered under their best-case scenario—i.e., if everything had gone their

---

[6]It is true that all of these transactions closed on the same day and that the loans were expressly for the purpose of investing in AOM.  Perhaps plaintiffs therefore regard these various transactions as intertwined.  Either way, however, one would expect the interest payments to receive equal treatment on both sides of the ledger: Either those payments are relevant to the rescission remedy, in which case they should increase Ploen's recovery but reduce Enrico's, or they are not, in which case they should not be included in the calculation for either plaintiff.

way while litigating the underlying cases.[7]  *See* Case No. 21-CV-2248, ECF No. 169

¶ 113.  As any experienced trial lawyer knows, only rarely does everything go well in

litigating a civil lawsuit.  The Court agrees with defendant's expert, retired Justice Sam

Hanson of the Minnesota Supreme Court, that one would expect to see such a large

settlement only in a "slam dunk" case—the kind of case that a party would almost

surely win on a motion for summary judgment.  TT 697, 700–01.  And as Justice Hanson

explained, this was far from a slam-dunk case.

Without question, plaintiffs had a lot of evidence in their favor.  Most

importantly, plaintiffs had evidence that AOM concealed material negative information

that rendered it extremely unlikely that AOM would be able to pay cash dividends.

Even worse, at the same time that AOM was receiving this information, it was

reassuring plaintiffs that the business was doing well.

Despite this evidence, however, plaintiffs still faced significant hurdles to

prevailing on their negligent-misrepresentation claims:

---

[7]The Court's calculation includes the $250,000 payment that AOM made to each
plaintiff as part of the settlements.  Plaintiffs contend that these sums should not be
considered because plaintiffs are not seeking to recover them from AIG.  The Court
disagrees, as they are manifestly part of the total package that plaintiffs received in
exchange for dismissing their claims and therefore must be considered when
determining whether the settlements are reasonable.  Even if plaintiffs are correct,
however, the settlements still represent a very high percentage of the maximum
potential recovery: 74 percent for Ploen and 84 percent for Enrico.

To begin with, plaintiffs faced a real risk of losing the negligent-misrepresentation claims altogether on the basis that AOM did not owe them a duty of care. Although Delaware law[8] is somewhat in flux on this issue, the recent trend appears to be to require a showing of a "special relationship" between the parties. *See Blueacorn PPP, LLC v. Pay Nerd LLC*, 310 A.3d 590, 593–94 (Del. Ch. 2024) ("Negligent misrepresentation requires either a fiduciary or other special relationship. . . . The Court of Chancery generally does not apply fiduciary duty doctrine to ordinary commercial transactions." (citation and quotation marks omitted)).

True, Delaware cases also recite that, in the alternative, a plaintiff can plead a "justification for a remedy that only equity can afford." *Id.* at 594 (citation and quotation marks omitted). But Delaware courts have cast some doubt on the viability of this method as an alternative way to state a claim for negligent misrepresentation: "In my view . . . equitable fraud cannot be asserted simply by alleging common law fraud minus scienter and tacking on a request for restitution." *LVI Grp. Invs., LLC v. NCM Grp. Holdings, LLC*, No. 12067-VCG, 2018 WL 1559936, at *18 & n.243 (Del. Ch. Mar. 28, 2018) (dismissing negligent-misrepresentation claim where the contract "was a carefully drafted document" and the parties "were presumably represented by competent counsel during the merger negotiations").

---

[8]As noted, both judges in the underlying cases ruled that plaintiffs' claims were governed by Delaware law.

Even if a claim for an equitable remedy (such as restitution) were enough to establish a basis for bringing a negligent-misrepresentation claim, it is by no means certain that plaintiffs would have been granted that equitable remedy. In particular, "rescission is a remedy rarely granted, as it results in the abrogation or unmaking of an agreement and attempts to return the parties to the *status quo*." *Williams v. White Oak Builders, Inc.*, No. Civ. A. 17556, 2006 WL 1668348, at *5 (Del. Ch.) (citation omitted), *aff'd*, 913 A.2d 571 (Del. 2006). In short, plaintiffs faced a significant risk that their negligent-misrepresentation claims would fail as a matter of law.

Somewhat relatedly, there was also a possibility that plaintiffs could have been awarded damages instead of rescission. As noted, under Delaware law, rescission is rarely granted and requires both that the party seeking rescission act with reasonable diligence and that the court have the ability to "restore the parties substantially to the same position which they occupied before making the contract." *Kostyszyn v. Martuscelli*, No. 8828-MA, 2014 WL 3510676, at *5 (Del. Ch. July 14, 2014). A court may well have found that, by the time plaintiffs filed their lawsuits—nearly four years after the transactions closed—returning the parties to the status quo was no longer possible.

In addition, in order to prevail, plaintiffs had to prove that their reliance was justifiable. *Blueacorn PPP*, 310 A.3d at 594. Plaintiffs are wealthy, experienced, sophisticated businessmen and investors who had their own lawyers and advisors.

They had the contractual right to obtain whatever information they needed to make an

informed decision about whether to invest in AOM. They knew (or reasonably should

have known based on information available to them) that the transactions were

investments and that the ability of AOM to pay cash dividends—the whole point of the

investments—was conditioned on AOM meeting specific financial metrics.

Accordingly, they knew (or should have known) that AOM's financial status was of

critical importance. And finally, plaintiffs learned, the day before the scheduled

closing, that AOM's lenders were conditioning AOM's ability to pay cash dividends *to

plaintiffs* on AOM having $3 million in liquidity. That was a red flag, and it should have

caused plaintiffs to postpone the closing and ask their lawyers to conduct due diligence

on AOM.

    Despite all of this, plaintiffs failed to ask for any financial or other documentation

from AOM to verify what they were hearing from Nugent and others. Indeed, Enrico

testified that he relied on his "gut," that he did not read the transaction documents

because of a strong "trust factor," that he did not pay attention to his lawyer's

explanation of the transaction, and that he "probably would have signed anything Tony

Jacobson asked [him] to sign." TT 602–03, 614. At the same time, Enrico testified that

he "did not have a very high opinion of Shaun Nugent," whom he regarded as a "bogus

phony," and on whom he did not rely. TT 604–05. A factfinder could easily have

concluded that plaintiffs' reliance—and in particular their failure to conduct due

diligence—was not justifiable.

Plaintiffs contend that this is irrelevant because no documentation would have

informed them of the falsity of the statements that AOM made in the hours leading up

to the closing, when AOM found out that it was losing major clients and had fallen

significantly short of its financial projections.  Nevertheless, as AIG's expert pointed

out, due diligence would have uncovered the precarious nature of AOM's business and,

in particular, that AOM's financial forecasts and ability to pay cash dividends were

heavily dependent on retaining State Farm's business even though State Farm had not

yet committed to working with AOM.  TT 691–93.  Plaintiffs' own evidence

demonstrated that AOM was doing poorly long before the transactions were even

proposed; indeed, the deteriorating financial condition of the company was the very

reason why AOM was soliciting investments from plaintiffs.  Based on these

circumstances, a finder of fact could have concluded that, had plaintiffs conducted due

diligence, they would have realized that AOM's forecasts were too optimistic, and that

plaintiffs' failure to conduct due diligence was both unreasonable and a cause of their

damages.  Moreover, even if a factfinder found that plaintiffs justifiably relied on the

later misrepresentations, plaintiffs faced at least some risk that their recovery might be

reduced under comparative-fault principles due to their lack of due diligence.  TT

812–13 (defense expert opining that Delaware's comparative-fault statute would likely apply to a negligent-misrepresentation claim).

Plaintiffs point to various countervailing circumstances that, they claim, render the settlements reasonable. The Court does not find that these circumstances appreciably change the calculus. For example, plaintiffs point out that their lawsuits put AOM at risk of bankruptcy. That may be true, but this factor is a wash. The risk of AOM going bankrupt would have given AOM an incentive to settle, but it also would have put plaintiffs at significant risk of being unable to collect any judgment, thereby creating a concomitant incentive for plaintiffs to settle. TT 697–98, 706–07. Plaintiffs contend that this analysis ignores the availability of insurance, but at the time of settlement, AIG had denied coverage, so plaintiffs still faced a risk that any judgments in their favor would be uncollectible. Similarly, while AOM would have wanted to avoid incurring further litigation costs, the same is true of plaintiffs, whose own expert opined that they would not be able to recover their attorney's fees. TT 697–98, 704–06. This factor is therefore also essentially a wash.

Finally, the Court notes that, even if the Court were required to consider the value of the fraudulent-inducement claims, the settlements would still be unreasonable. As plaintiffs acknowledge, the fraudulent-inducement claims "were simply alternative legal theories that sought the exact same damages." Case No. 21-CV-2248, ECF No. 169

at 57.  Accordingly, the only way that the fraudulent-inducement claims would

materially increase the settlement value of the overall case is if they were stronger than

the negligent-misrepresentation claims.  Plaintiffs themselves, however, clearly

regarded the fraudulent-inducement claims as being more difficult to prove and

thereby having less value than the negligence claims.  In particular, while plaintiffs

would not have had to prove a duty, they would have had to prove scienter.  *See id.*

at 57 (arguing that "the negligent-misrepresentation claims were easier to prove

because, unlike fraud in the inducement, those claims did not require proof of

scienter").  The near-simultaneous emails in the hours leading up to the closing would

have been very helpful to plaintiffs in this regard, but plaintiffs nevertheless faced a

significant hurdle in that AOM shared the negative information with Jacobson, *see* Ex.

P73, who was not just one of the investors but also a trusted friend of both Ploen and

Enrico.  This fact would have severely undermined any inference that AOM was

intentionally deceiving Ploen and Enrico.  Accordingly, the Court finds that considering

the fraudulent-inducement claims would not alter its conclusion that the settlements

were unreasonable.

In sum, the settlements reached by plaintiffs would have been reasonable only if

plaintiffs had "slam dunk" cases against AOM.  They did not.  To the contrary,

plaintiffs faced significant hurdles, and had plaintiffs gone to trial, there was a

substantial chance that they would have recovered nothing (after incurring significant and unrecoverable attorney's fees and costs).  That risk should have been fully reflected in the amount of the settlements.  It was not, and therefore the settlements were not reasonable.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT plaintiffs shall recover nothing on their claims against defendant.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 10, 2024                    s/Patrick J. Schiltz_____
                                            Patrick J. Schiltz, Chief Judge
                                            United States District Court